**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION AT ABINGDON**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **CHAPTER 11** |
| **CLINCH MOUNTAIN FINISHING** | ) | |
| **& LOGISTICS CORP.,** | ) | **CASE NO. 10-72574** |
| | ) | |
| Debtor. | ) | |

## MEMORANDUM DECISION

The matters before the Court are the Debtor's Amended Motion for Entry of a

Sale Procedures Order (a) Approving Sale of Assets Free and Clear of All Liens, Encumbrances,

and Other Interests, (b) Scheduling a Final Hearing Date, and (c) Approving Notice and Entry of

an Order Approving the Sale Free and Clear of Liens, Interest, and Other Encumbrances of

Certain Assets of the Corporation, filed December 10, 2010 as docket entry # 62, the United

States Trustee's Motion to Convert to a Case under Chapter 7 or to Dismiss, filed December 13,

2010 as docket entry # 65, the Response and Objection of VFI[1] to the Debtor's Motion filed

January 4, 2011 as docket entry # 74, and the United States Trustee's Objection to that Motion

also filed January 4, 2011 as docket entry # 75.  The two motions in question will be referred to

in this Memorandum Decision as the Debtor's Motion and the United States Trustee's Motion

and collectively as the Motions.  A lengthy hearing was held upon these Motions on January 5,

2011 at the conclusion of which the Court requested that counsel for the Debtor, VFI and New

Peoples Bank (the "Bank") meet and confer regarding an appropriate resolution of certain joint

---

[1] The Court will utilize the same identifying designations as it used in its Memorandum
Decision dated December 9, 2010, docket entry # 60, upon the Debtor's original sale motion.
That ruling is hereby incorporated by reference.  The designation VFI refers collectively to VFI
Associates, LLC and Reconstituted VFI, LLC.

and possibly conflicting ownership issues as to certain of the property in which the Debtor has an

interest.  Counsel honored the Court's request and did meet and manage to resolve many but not

yet all of such issues as reflected in a letter from Debtor's counsel and VFI's counsel sent to the

Court on the evening of January 6, which the Court directed be docketed together with its letter

to them in response, which can be found as docket entry ## 81 and 82, respectively, and as

supplemented in a follow up letter received on January 12th from VFI's counsel, which can be

found as docket entry # 84.  At the conclusion the Court expressed to those present some of its

preliminary thinking regarding the Motions but took them both under advisement pending

receipt of a requested report from counsel as to the outcome of their discussions already noted

above.  The matters in question are now ready for decision.  That decision is to grant upon the

conditions hereafter noted the Debtor's Motion and to deny preliminarily the United States

Trustee's Motion but to continue the same for a final hearing to take place promptly following

either a completed sale of those assets to be sold pursuant to the Debtor's Motion or the Court's

determination that the efforts to effect a sale pursuant to that Motion have failed.

FINDINGS OF FACT

The Court will not repeat here the factual findings made in its December 9, 2010

Memorandum Decision which has already been incorporated by reference into this decision.  Mr.

Lawson, the Debtor's chief executive officer, testified at length at the January 5th hearing with

respect to both Motions.  It appears that the Debtor's business has stabilized since the December

1st hearing.  In fact, the Debtor's best customer, which at the time of the prior hearing was

threatening to take its business elsewhere, has continued giving work to the Debtor and has even

indicated an intention to increase its orders in the future.  Mr. Lawson believes that the Debtor

2

will continue to be able to pay its power bill and other operating expenses and testified that the

Debtor continues to operate on a "break even" basis in bankruptcy.  Since the earlier hearing he

has conferred with Mr. Gaines Dickenson, an auctioneer who frequently is used by Mr. Robert

Wick, one of the Chapter 7 panel trustees of this court, about a possible sale of the company's

assets at a sale which would contemplate the assets being offered in lots and then grouped to

obtain the best possible total sale result.  Mr. Lawson further testified that he has received

informal expressions of interest from potential bidders for the Debtor's business and assets.  He

continues to maintain the hope that the business might be sold as a going concern to a purchaser

who might continue to operate it in its existing location in the manufacturing facility owned by

Lambo Properties as well as the belief that a sale of the company while it continues to operate is

most likely to achieve the best result.  As a principal of Lambo Properties he would entertain

discussions with any purchaser of the Debtor's assets as to a possible purchase or lease of the

manufacturing plant, but he has not considered actual possible terms which might be offered to

such a purchaser.[2]  Neither has he apparently given much thought to the future progress of this

bankruptcy case if a sale of the Debtor's assets takes place, with a possible dismissal of the case

following such a sale being the only scenario he specifically alluded to in his response to a

question from the Assistant United States Trustee.

Mr. Lawson, in response to a question from the Court, testified as to two principal

motivating concerns which resulted in the decision to file this case:  the severe financial strain

upon the Debtor of trying to defend the litigation brought by VFI and others against the Debtor

---

[2] Such an offer may not long continue to be within Mr. Lawson's power to make as he testified that in December New Peoples Bank sent a notice of default to Lambo Properties as to its loan or loans from the Bank and demanded payment in full of such loan(s).

3

and others which had about exhausted the Debtor's cash resources, and a desire to effect a sale of the Debtor or its assets in an advantageous manner.  The assets which the Debtor proposes to sell are subject to a lien in favor of New Peoples Bank which Mr. Lawson believes to be valid and is for an amount considerably greater than what might reasonably be expected to be obtained from a sale of the Debtor's assets.  Although in response to a question from the Court Mr. Lawson testified that the Bank had a security interest in general intangibles, Debtor's counsel then introduced into evidence without objection copies of three different Financing Statements[3] from the Debtor in favor of the Bank as the secured party and which appeared to have been filed with the State Corporation Commission of Virginia.  The most recent of these Financing Statements was filed more than three years prior to the bankruptcy filing.  While the first two of these Statements were purely against equipment, including replacements, the third, filed in 2007, was broader, including not only equipment but also inventory and rights to payment.[4]  It does not, however, specifically identify all general intangibles as being subject to the Bank's security interest.  Mr. Lawson was not questioned about whether the Debtor owns any intangibles having economic value, such as trade names or trademarks, proprietary manufacturing processes or similar information, trade secrets, or other intellectual property.  He did testify, however, in response to questioning from Debtor's counsel, that he believes that the Debtor has certain

---

[3] No evidence was offered with respect to the security agreements which presumably would underlie these Financing Statements.

[4] The specific language with respect to rights to payment is as follows:  "and all rights to payments, whether or not earned by performance, including, but not limited to, payment for property or services sold, leased, rented, licensed, or assigned.  This includes any rights and interest (including all liens) which I have by law or agreement against any account debtor or obligor."

4

claims against both VFI and Lambo Properties.  As to the latter entity, he was not aware of any

signed lease between it and the Debtor with respect to the facilities used by the latter in its

operations, but he testified that the Debtor, up until but not including the month of September,

2010, had been making a monthly payment of $20,000 to the Bank which was in lieu of any

obligation to Lambo for use of its property.

The Debtor's Motion seeks approval by this Court of proposed bidding

procedures which would require potential bidders to submit an earnest money deposit or

irrevocable letter of credit in the amount of $10,000 together with a written irrevocable offer to

purchase the Debtor's assets "as sold in groups and as a whole."  These proposed procedures

expressly provide for the Bank's right to credit bid in the sale and that if its security interest is

later invalidated or subordinated, the Bank would be liable to the estate for the amount of any

winning bid.  A copy of these procedures is appended to this decision and also is docketed as

Exhibit A to the Debtor's Motion.

The United States Trustee's Motion seeks conversion or dismissal for cause

pursuant to 11 U.S.C. § 1112(b)(4) and asserts in ¶ 14 that  "the inability of the debtor to

rehabilitate its business, potential continuing accrual of administrative expenses without a

reasonable ability to pay said expenses, and the potential of claims against present and former

officers all constitute cause for conversion or dismissal pursuant to the provisions of §1112(b)(4)

of the Code."  The evidence before the Court does suggest strongly that the Debtor will be

unable to rehabilitate its business.  Indeed that appears to be the perception of the Debtor's own

chief executive officer, Mr. Lawson, and appears to be consistent with the latter's testimony that

one of the principal reasons for filing this case was to effect a sale of the Debtor's assets.  The

5

evidence further supports a finding that the continuation of this case is likely to result in a

continuing accrual of administrative expenses which the Debtor may well not be in a position to

pay absent the consent of the Bank, which holds a purported security interest in most, but

perhaps not all, of the Debtor's assets.  As to the "potential" for claims against present or prior

officers of the Debtor, while it is clear that Mr. Lawson may labor under the cloud of a conflict

of interest between his roles as chief executive officer of the Debtor and the manager of Lambo

Properties, the evidence fails to provide any specifics as to potential claims which the Debtor or

its creditors might have against its own officers.

      After the conclusion of evidence at the hearing the Court advised those present

that it was considering denying the United States Trustee's Motion preliminarily at this stage of

the case, granting the Debtor's Motion, subject to certain conditions, and at a final hearing upon

the United States Trustee's Motion being inclined to convert the case to Chapter 7 so that an

independent trustee could take any actions necessary to protect the interests of the unsecured

creditors.  The Court described its thinking as being driven by its assessment of the practicality

of the likely results if it immediately converted the case to Chapter 7 or dismissed the case.

Conversion of the case would likely result in the Chapter 7 trustee abandoning the assets subject

to the Bank's security interest, assuming the absence of any likely prospect of invalidating or

subordinating the lien, with the Bank, after some period of delay, then proceeding to effect a sale

of its collateral.  Immediate dismissal of the case would again result in the Bank's enforcement

of its lien under a cloud of the other claims against the Debtor and the uncertainty that such a

situation almost inevitably entails.  In short, the Court found somewhat persuasive the rationale

advanced by both the management of the Debtor acting as debtor-in-possession in bankruptcy

and the Bank as its secured lender that a court supervised sale of the Debtor's assets while the

company was an operating entity was most likely to achieve the best sale result.  That goal is one

which would reduce the magnitude of the Bank's presumptive deficiency claim from a sale and

thereby minimize the size of the pool of general unsecured claims against any assets of the

bankruptcy estate which may prove to be free and clear of the Bank's security interest.  After the

conclusion of the arguments of counsel for the Debtor, counsel for VFI and the Assistant United

States Trustee, the Court invited other counsel present to speak on behalf of their clients.  David

Hutton, Esq. advised the Court that he represented both the Town of Lebanon, which had an

unsecured claim against the Debtor, and Russell County, which had a claim for unpaid personal

property taxes protected by a lien against the tangible personal property subject to such taxes.

He endorsed the approach being considered by the Court over either immediate conversion or

dismissal of the case.  Joyce Kilgore, Esq., general counsel for the Bank, likewise expressed the

Bank's support of a court-supervised sale of the Debtor's assets with the Debtor continuing to

operate under the protection of the automatic stay until such a sale could be effected.  There was

no indication that any other creditor appeared at the hearing, either personally or by counsel.[5]

On the basis of the evidence before the Court at this stage of this case, it finds that

the Debtor filed its petition in this Court in good faith and has also filed the Debtor's Motion in

good faith.  The Court further confirms the factual findings made in its Memorandum Decision

dated December 9, 2010 following the hearing upon the Debtor's original Motion.  The Court's

---

[5] On November 30, 2010 the United States Trustee filed with the Court a notification of
the appointment of an Unsecured Creditors Committee consisting of Steven Neal Cole, CPA,
Mike McFerrin of Triad Packaging, Inc. and Rachel Potter of MXI Environmental Services,
LLC.  To this point the Committee has not taken any formal position with respect to the Motions
and the Court is not aware that any member of the Committee attended the January 5th hearing.

notice to creditors of the Debtor's bankruptcy filing also notified them of the first meeting of

creditors pursuant to 11 U.S.C. § 341 to be held on December 10, 2010.  The Court has been

given no reason to believe that such meeting did not take place as scheduled.

SUMMARY OF OBJECTIONS TO THE DEBTOR'S MOTION

The United States Trustee objects to the Debtor's Motion on the following

grounds:

1. All bases for objection lodged by him to the Debtor's first motion to sell free and clear

of liens were incorporated by reference.

2. Denies that the Debtor has a sound business purpose for said sale or otherwise meets

the criteria set forth in *In re WBQ Partnership*, 189 B.R. 97 (Bankr. E.D.Va. 1995) and

specifically points out various factual distinctions between the facts of that case and this one.

3. Here the only stated business purpose was to potentially provide employment to the

Debtor's employees.  The Debtor, however, legally has no employees.  In addition, there is no

provision in the proposed agreement requiring that the assets be kept where they are, nor any

indication of a potential lease agreement, nor any agreement from the secured lender to lease the

premises to a prospective purchaser.

4. The terms and conditions of the proposed auction indicate that the proposed sale is not

in good faith to-wit:  the Bank can bid any amount it likes up to the full amount of its secured

claim, thereby chilling any potential bidder who has not entered into some agreement with the

Bank.  Such a provision is not in good faith.

5. There is no requirement of any marketing effort made or required under the terms of

the proposed sale.

8

6. Allowance of this sale will simply continue to increase the administrative costs of this case to no benefit to anyone other than potentially to the secured creditor.  There appears to be no reason that the secured creditor cannot fully protect its interests under state law without needlessly protracting this case.

VFI's Objection asserts that the amended motion fails to adequately address several of the provisions and concerns set forth in the Court's December 9th decision, specifically:

1. Although the Debtor has added section 9 to the bidding procedures relating to the ability of New Peoples Bank to submit a "credit bid" during each contemplated segment of the proposed auction sale, New Peoples Bank may not submit a credit bid against or to acquire the 50% ownership interest of VFI in certain property included by the Debtor in its Motion.

2. The proposed sale date does not provide sufficient time for a "well thought out, properly advertised, and expertly conducted sale to take place" (quoting the December 9 decision).

3. The proposed sale does not allow adequate time for any dispute as to ownership of assets claimed by the Debtor and VFI to be fairly resolved.

4. The Debtor's Motion and hearing notice fail to address the conflict of interest of the Debtor's principals.

5. VFI is the sole owner of two lines of finishing equipment that are located in the same facilities occupied by the Debtor.  Prior to the date the Debtor filed its petition, certain valuable pieces and components of VFI's equipment, including an expensive single head sander, were removed from VFI's equipment without its authority and installed on Debtor's lines of wood

9

finishing equipment.  Other parts of VFI's equipment have been cannibalized and incorporated

into the Debtor's lines and therefore the latter does not own any of the components, pieces or

parts that have been wrongfully taken and converted.  The Debtor is without authority and

should not be permitted to sell, market, or otherwise seek to dispose of the assets in which VFI

holds an ownership interest.  VFI is the 50% owner of the equipment delineated in the last two

pages of  Exhibit B attached to the Debtor's Motion, consisting of two forklifts, five strapping

machines, certain chemicals, twenty five rollers, boxes, office furniture, computers and printers.

VFI does not consent to the sale of its interest in the assets.

6.  In addition, VFI contends the computer equipment should not be sold as it contains

records and data relating to Debtor's business operations and/or other evidence that should be

preserved and that the Debtor should be required to file an adversary proceeding seeking to

determine (i) the nature and extent of its interest in the assets that it intends to sell as well as any

other claimed assets, and (ii) the nature, extent and validity of any lien against its assets claimed

by the Bank.  It concludes by reiterating its opposition to the Debtor's Motion, asking that it be

denied and that the Debtor be required to file a Disclosure Statement and Plan.

CONCLUSIONS OF LAW

This Court has jurisdiction over this proceeding by virtue of the provisions of 28

U.S.C. §§ 1334(a) and 157(a) and the delegation made to this Court by Order from the District

Court on July 24, 1984.  The Court concludes that a motion to approve a sale of the Debtor's

assets pursuant to 11 U.S.C. § 363 is a "core" bankruptcy proceeding pursuant to 28 U.S.C. §

157(b)(2)(N) and (O).  The Court further concludes that a motion to dismiss or convert a case

pending before it is also a "core" proceeding because such a matter is inherently an essential

10

element of the Court's exercise of the jurisdiction delegated to it by the District Court.

As noted by this Court in its December 9, 2010 decision, this case presents the difficult issue of when a bankruptcy court should be willing to approve a sale of substantially all of a debtor's assets used in the conduct of its business during the early weeks of a Chapter 11 case without the protections offered by a disclosure statement and confirmed plan of liquidation. In determining that issue the Court confirms its conclusions of law contained in its prior decision already referenced.

11 U.S.C. § 1112(b)(1) provides that, absent "unusual circumstances specifically identified by the court," it shall convert or dismiss a Chapter 11 case if the movant establishes "cause." The term "cause" is not explicitly defined but § 1112(b)(4) gives a number of examples of what it includes. The only one of those examples which appears relevant to the circumstances presented in this case is the first one provided by the statute: "substantial or continuing loss to or diminution of the estate **and** the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A) (emphasis added). Although the evidence before the Court does establish the absence of a "reasonable likelihood of rehabilitation," it does not demonstrate that the Debtor's continued operation while a sale of its assets is being accomplished creates a substantial risk of diminution of the bankruptcy estate. Although the testimony of Mr. Lawson contained some ambiguity, its general import was that the Debtor has been and continues to operate on basically a "break even" basis. In fact his testimony on this subject was considerably more positive and optimistic at the most recent hearing than it was at the original hearing. There is a concern that this case could end up being administratively insolvent, but the Court will deal with that point in the portion of this decision setting forth the conditions of its approval of the Debtor's Motion.

11

Accordingly, the Court concludes that "cause" within the meaning of § 1112(b)(4)(A) has not

been established.  While the examples of "cause" provided by the statute are not exclusive, the

Court concludes that it ought not to devise a different test for "cause" on an issue explicitly

addressed by the statute.  The Court further concludes that the evidence before it does not

support any determination that any of the other specific examples of "cause" provided by the

statute, such as "gross mismanagement of the estate," has been established.

       The Court further concludes that it ought to authorize a sale of the Debtor's assets

without requiring that such a course of action be submitted to creditors in a Plan of Liquidation

accompanied by an approved Disclosure Statement for the following reasons:

    1.  Unless there is some significant question about the validity of the Bank's security

interest in the Debtor's assets, and no evidence or even claim of any specific defect in or defense

to such lien or that there is any reasonable prospect of any equity in such assets having yet been

presented to the Court, it is not clear why the liquidation of such assets or the manner in which it

may be effected ought to be presented to the general creditors for a vote as long as a sale

reasonably designed to achieve the best possible result takes place.

    2.  There is no reason appearing to the Court why the Bank's self-interest in obtaining the

most advantageous disposition of its collateral is in doubt or in some way tainted or that such

self-interest is in any manner in conflict with the Debtor's other creditors.  While it is true that

the Debtor's chief executive officer does have something of a conflict of interest by reason of his

interest in Lambo Properties, he seems to have a considerably more important concern to him as

a guarantor of the debt of both such entities to the Bank.  It is clear that he has a strong

motivation to work closely with the Bank to effect an advantageous sale of assets to minimize as

best he can his personal liability to the Bank upon these obligations, an exposure which is

secured by a substantial number of shares of stock in the Bank which he owns.

    3.  While the Court is always appreciative of the opinions and positions of the United

States Trustee in Chapter 11 cases and always attempts to give them considerable weight in its

decision-making process, he is not a creditor of course and therefore has no economic stake in

the outcome, just as the Court itself has no such stake.  When the business judgment of the

Debtor's management appears to be reasonable and make financial sense and is supported by

creditors who do have an economic stake in the outcome, the Court is bound to give heavy

weight to that fact in its deliberations.  In this case, the Bank, which is the creditor whose

interests are most vitally at stake in a sale of its collateral; Russell County, which also appears to

have an interest in the property proposed to be sold; and the Town of Lebanon, which appears to

be an unsecured creditor, all favor a court-supervised sale of the Debtor's assets, the very relief

sought by the Debtor's Motion.  It is true that VFI does not support a sale and prefers dismissal

of the case.  The Court's own assessment is that the Debtor's other creditors will be better served

ultimately by a conversion of the case to Chapter 7 in which an independent trustee will do

everything in his or her capacity to protect and advance the interests of the unsecured creditors.

The Court also observes that VFI has been and continues to be involved in very substantial civil

litigation against the Debtor and other parties and its interests in this case may not line up

completely with the interests of the Debtor's other creditors, especially in light of its claims to an

ownership interest in some of the property proposed to be sold.  Accordingly, while the Court

does not by any means disregard VFI's position as creditor, it does believe that it should be

discounted somewhat vis-a-vis the preferences of the Debtor's other creditors which have

demonstrated enough interest in this case to participate in it.

4.  The entitlement of the Bank to "credit bid" in a sale of its collateral is one expressly

accorded by the Bankruptcy Code in § 363(k) "unless the court for cause orders otherwise."

While it is true that the right of "credit bid" only extends to the extent of its lien in the assets

being sold, and not, for example, in any property of VFI which is not subject to its lien, the Court

is satisfied that it can condition its approval of the Debtor's Motion so as to protect both the

Bank's credit bid right and VFI's legitimate property interests.  The Debtor and VFI have now

resolved most of the issues relating to VFI's property interests, and the Court is satisfied that any

remaining issues can be resolved voluntarily by the parties or, if that confidence proves

misplaced, by an adversary proceeding or other acceptable process determined on a very

expedited basis.  These competing interests will have to be resolved in some form or by

voluntary agreement of the parties whether a sale takes place under the supervision of this Court

or otherwise.  The Court also observes that even at a secured party's direct sale of personal

property collateral, the secured creditor, except with respect to the costs of the sale and the

satisfaction of any interests having priority over such party's lien, as a practical matter has a

right of "credit bid" because there would be no compulsion to lay out in cash the amount of the

credit being entered to the balance of the secured debt.

5.  The United States Trustee's concern with the administrative expenses of the case is a

very legitimate one, but the Court believes that it can adequately deal with that matter in the

conditions it intends to impose upon its approval of the Debtor's Motion.

6.  VFI also raises some valid concerns about the proposed sale, but again the Court

believes that it can adequately deal with these concerns in the conditions it intends to impose

14

upon its approval of the sale, including a deferred sale date to permit adequate advertising and promotion of the sale and sufficient time, if needed, to resolve any property disputes between that creditor and the Debtor.

7.   The Court believes that the Debtor's Motion and the hearing notice are adequate to put the creditors on notice of the conflicting interests of the Debtor's principal officers.

DECISION

By a separate order the Court will approve the Debtor's Motion subject to the following conditions and changes:

A.   The Bank will provide within fourteen (14) days its written consent to the sale of the Debtor's assets free and clear of its security interest(s) in such property, but subject to its right to "credit bid."   The right to "credit bid" will be subject, however, to the Bank's agreement that it will be responsible to pay in cash (i) the reasonable administrative costs incurred in this case to enable the sale to take place and to close, and (ii) the amount of any interest in the assets being sold having priority over the Bank's lien, expressly including any valid lien for unpaid taxes. The Bank shall acknowledge and consent to this condition in writing, but this obligation shall not limit the Bank's rights to object for cause and be heard as to any particular expense claimed or to the reasonableness of any specific amount.   The ruling of the Court upon any such objection shall be binding upon the Bank and other parties affected by it.   The Bank shall also acknowledge that it shall be responsible to the bankruptcy estate for the amount of any successful credit bid made by it in the event that its security interest in the assets thereby acquired by virtue of such bid is later invalidated or subordinated by a final ruling of this Court. In the event by agreement of the parties any property is proposed to be sold in which the Debtor

15

owns less than 100% of the ownership interests in such property, the right to "credit bid" shall be applicable only to the extent of the Debtor's ownership of such property.

B.  The proposed auction sale date shall be postponed from the proposed date of February 2, 2011 to March 2, 2011.  Within seven (7) days of the entry of the order the Debtor shall file an employment application for a qualified auctioneer or other sales agent to organize and conduct the proposed sale.  Counsel for the Debtor shall endeavor to tender to the Court with such application or promptly thereafter an agreed order endorsed by counsel for the Debtor, counsel for the Bank, and the Assistant United States Trustee or counsel for the United States Trustee granting the same.  In the event no such agreed order can be tendered, counsel for the Debtor shall pursue the earliest reasonably possible ruling by the Court upon any objection filed to such application.

C.  The Debtor shall promptly confer with the auctioneer or other sales agent approved by the Court to review whether any changes in the approved bidding procedures would be appropriate and advantageous.  The Debtor may make changes to such approved procedures or add additional terms or conditions, or waive complete compliance with such procedures only if it obtains either (i) the joint written approval of the Bank or its counsel and the Assistant United States Trustee or his counsel, or (ii) the Court's approval.  The Debtor shall specifically consider whether its trade name and/or any manufacturing technology or other proprietary information should be offered as a part of the possible sale of the Debtor's business as a continuing enterprise and make appropriate arrangements therefor, which shall include some equitable method to allocate the sale price among the types of property being sold or to offer such intellectual property separately so that it can be distinctly valued as a part of the aggregate sale price of the

16

enterprise.

D.  The Debtor shall obtain within fourteen (14) days of this date a written offer from Lambo Properties, approved in writing by the Bank, for a lease for a period of not less than two years from the date of closing, upon other customary terms stated in such offer, of the same premises now utilized by the Debtor in its manufacturing operations and conduct of its business, in the same general manner as now enjoyed by the Debtor, to any prospective purchaser of all of the Debtor's property offered in such sale desiring to continue the Debtor's business in its existing location.  This condition is not intended to preclude any offer to sell the property in question to a successful bidder.

E.  In the event any unresolved disputes remain between the Debtor and VFI concerning the ownership of any property proposed to be sold in the sale as of this date, such parties and/or their counsel shall confer promptly in a good faith attempt to settle any outstanding issues.  In the event such efforts are unsuccessful, counsel for the Debtor shall contact chambers to arrange a telephone conference involving the Court, counsel for the Debtor, VFI and the Bank to discuss an expedited procedure for the Court's determination of any such remaining issues.

F.  The Bank will continue to permit the use of its cash collateral to fund the Debtor's operating expenses while it continues to operate under the protection of the Court.  The Bank shall continue to have the right, however, to continue to approve the Debtor's budget.  In all events all payroll tax obligations shall be satisfied.  In no event shall the Debtor incur obligations while continuing to operate in Chapter 11 for which payment is not assured, including but not limited to its obligations to suppliers and utility service providers.

17

This 13th day of January, 2011.


_____
UNITED STATES BANKRUPTCY JUDGE

## BIDDING PROCEDURES

Clinch Mountain Finishing & Logistics Corp. ("CMFL") shall conduct a sale by auction (the "Auction") of substantially all of its assets. The Bidding Procedures were approved by order dated January____, 2011, (the "Sale Procedures Order") of United States Bankruptcy Court for the Western District of Virginia, Roanoke Division in the Chapter 11 proceeding of Clinch Mountain Finishing & Logistics  Corp. case number 10-72754.

The following Bidding Procedures shall apply to the Auction:

1. <u>BIDDING DEADLINE</u>. Any proposal by a bidder for the purchase of the Purchased Assets must be submitted in writing so that is received by CMFL no later than 4:30 PM Eastern standard time on January 28, 2011. All bids shall be submitted to CMFL at the following address: Copeland & Bieger, P.C., attention Robert T. Copeland 212 W. Valley St., Abingdon, VA 24210 or by facsimile transmission  to 276-628-4711 or by e-mail to rcopeland@copelandbieger.com .

2. <u>REQUIREMENTS FOR BID.</u>  Any bid must be:

(a)For cash;

(b) A written irrevocable offer: (i) stating that the bidder offers to consummate the Transaction; accompanied by the bidder's tax identification number and either payment of an earnest money deposit of TEN THOUSAND DOLLARS ($10,000) by certified or cashier's check made payable to Clinch Mountain Finishing & Logistics Corp. or an irrevocable Letter of Credit from a financial institution in the amount of TEN THOUSAND DOLLARS($10,000.00) and delivered to counsel for the corporation at the address shown above;

(c) for the assets of the Clinch Mountain Finishing & Logistics Corp. as sold in groups and as a whole; and

(d) Supported by sufficient proof that the bidder or representative is legally empowered to both bid on behalf of the bidder and also to complete and sign on behalf of the bidder a binding and enforceable purchase agreement.

3. <u>QUALIFIED BIDS.</u>  For any Bid to be considered a Qualified Bid the Bid must comply with all Bid Requirements of paragraph 2 above.

4. <u>AUCTION.</u>  The CMFL auction shall be conducted on February 1, 2011 at 11:00 AM Eastern Standard Time in the United States Bankruptcy Court for the Western district of Virginia, located in Abingdon, Virginia or such other place and time as directed by the Bankruptcy Court. For a Bid to be considered, a bidder must appear in person at the Auction or through a duly

authorized representative. If multiple Qualified Bids are received, each such bidder shall have the right to continue to increase its Qualified Bid at the auction. Only bidders that have submitted a Qualified Bid may participate in the auction unless the court, for cause, orders otherwise. At the auction, the two lines of finishing equipment shall each be sold separately and after the sale of each of the lines, they will be offered together and then after the two lines are offered together, then  they will be offered for sale with all of the remaining equipment office, fork lifts, furniture and inventory. Should there be no bidder willing to bid higher than either the sale of each line of finishing equipment or the sale of both lines of finishing equipment, then  the inventory, remaining equipment, fork lifts and office equipment shall be bid upon and sold separately. All bids at the Auction must satisfy the Bid Requirements (other than compliance with the Bid Deadline, which is applicable only to the initial Qualified Bids). Bidding shall continue until the highest and best bid has been made and no other bidder who has submitted a Qualified Bid in attendance at the auction desires to bid. The bidder (or bidders) that, is acceptable to New Peoples Bank and the debtor, prevails at the auction by presenting the highest and best Qualified Bid is referred to as the "Prevailing Bidder".

5. HEARING AND SALE FREE AND CLEAR OF LIENS. A hearing shall commence immediately following the conclusion of the Auction, or such other time designated by the Bankruptcy Court, for the purpose of entry of an order approving the sale of the purchased assets to the prevailing bidder (the "sale hearing"). Sale of the assets shall be free and clear of any and all liens, claims, interest, rights and encumbrances of any sort whatsoever against CMFL.

6. CLOSING. The closing of the sale of the Purchased Assets to the Prevailing Bidder will occur in accordance with the terms of the executed purchase agreement or other purchase agreement, or as otherwise ordered by the court.

7. FAILURE TO CONSUMMATE PURCHASE. If for any reason the Prevailing Bidder fails to consummate a purchase of the Purchased Assets, or any part thereof, the next highest and best Qualified Competing Bid for the purchased assets( or any part thereof) shall be treated as the back-upper bidder (the "Back-up Bidder") and by bidding on the purchased assets: agrees that its highest bid shall remain irrevocable pending the closing of the sale of the Purchased Assets to the Prevailing Bidder and (b) consents to the holding of its deposit in escrow under the earlier of (i)  the closing date of the sale the purchased assets the Prevailing Bidder or (ii)  the 31st day after the date set for the auction. If the Prevailing Bidder fails to close on the Purchased Assets, the backup bidder will automatically be deemed to submit the highest and best qualified competing bid without further order of the Bankruptcy Court.

8. RESERVATION OF RIGHTS: DEADLINE EXTENSIONS. CMFL. reserves the right in consultation with New Peoples Bank to: (a) impose at or prior to the Auction, additional terms conditions on the sale of the purchased assets

consistent with the sales procedures order subject to Bankruptcy Court approval, if necessary; (b) extend the deadline set forth in the bidding procedures, adjourn the Auction at the Auction and/or adjourn the Sale Hearing in open court without further notice;(c)  seek guidance or relief from the bankruptcy court as to any issues relating to the Auction; and (d) seek all relief CMFL deems appropriate in connection with the sale, CMFL hereby reserving all rights and expressly waived herein where the purchase agreement.

## 9. RIGHT TO CREDIT BID.

New Peoples Bank shall have the right to credit bid during each segment of the sale: sale of finishing line 1, finishing line 2, the grouping of finishing line 1 and 2, the grouping of finishing line 1, 2 and all office equipment, furniture, fork lifts and inventory, or any combination of the above. Should the security interest later BE negated or subordinated New Peoples Bank would be liable to the estate for the amount of any such bid(s).

## 10. MARKETING PLAN:

Prior to the Sale, CMFL will send a Notice of Sale to all creditors, publish the Notice of Sale and Bidding Procedures in the Lebanon News and the Bristol Herald Courier and send a  copy of the Notice of Sale and bidding procedures to the approximately ten equipment dealers known to the Debtor and related parties.